**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WP4

| | |
|---|---|
| ROBERT RASTOCKY, on behalf of himself and all others similarly situated, | CASE 07 CIV 3755 |
| Plaintiff, | |
| v. | CLASS ACTION COMPLAINT |
| OPTIONABLE INC., KEVIN CASSIDY, and EDWARD J. O'CONNOR | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff alleges the following for his Complaint in the above-captioned matter. Plaintiff so alleges individually and on behalf of all persons and entities (the "Class") who purchased or otherwise acquired the common stock of Optionable Inc. ("Optionable" or the "Company"), between May 6, 2005 to May 10, 2007, inclusive (the "Class Period"). The allegations contained herein are made upon information and belief, except as to the allegations about Plaintiff and his counsel, which are made upon personal knowledge. Plaintiff's information and belief is based, among other things, on investigations made by and through his attorneys. Such investigation included, but has not been limited to, the review and analysis of: (a) filings made by Optionable with the United States Securities and Exchange Commission (the "SEC"); (b) press releases issued by the Company; (c) newspaper, magazine, and other periodical articles relating to Optionable and the allegations contained therein; and (d) other matters of public record.

**NATURE OF THE ACTION**

1.      This is a class action on behalf of all purchasers of the common stock of Optionable during the Class Period, seeking to pursue remedies under the federal securities laws.

2.      Based in Valhalla, New York, Optionable is a provider of natural gas and other energy derivatives trading and brokerage services.

3.      Throughout the Class Period, the Defendants issued several statements which touted their business prospects and continued growth. Those statements were false and misleading because they failed to disclose that the Company was in fact engaged in improper deals with its biggest client, the Bank of Montreal ("BMO") and that Optionable's business was extremely dependent on retaining BMO as a client. Defendants – Optionable and its senior officers and directors – were able to retain BMO as a client, however, only because they helped BMO and its star options trader – David Lee – mismark options, falsely the trading price at which BMO traded those options, and thereby hide massive losses incurred by BMO as a result of those trades. But for this fraudulent and undisclosed practice, Optionable would not have had BMO as a client and would not have been as successful as it was. Incredibly, Defendants took advantage of their fraudulent scheme and sold, during the Class Period and at the height of the Company's fraudulent scheme, roughly 10,758,886 shares of Company stock, for proceeds of about $28,941,403.

4.      Beginning on April 27, 2007, the truth regarding the Company's massive fraud was first revealed. On that day, the Company's stock dropped from $8.29 to $5.56, a single day drop of $2.73 or 33%. Following additional revelations over the next few days, the price of Optionable stock further dropped to $0.84 by May 10, 2007, representing a total drop of nearly 90%. During the Class Period, the stock traded as high as $9.10. As a result, investors lost millions of dollars as a result of the acts and omissions complained of herein.

2

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to: (a) Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and (b) 28 U.S.C. §§ 1331 and 1337.

6.      This action arises under and pursuant to: (a) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); (b) Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (c) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

7.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

## PARTIES

8.      Plaintiff purchased the Company's securities during the Class Period, as set forth in the attached Certification, and was damaged thereby.  Plaintiff resides in Arizona, Maricopa County.

9.      Defendant Optionable Inc. ("Optionable" or the "Company") is a corporation organized under the laws of the state of Delaware.  It maintains its principal place of business at 465 Columbus Avenue, Valhalla, NY 10595.

10.     Defendant Kevin Cassidy ("Cassidy") served as Optionable's Chief Executive Officer, Vice Chairman and Director during the Class Period.

11.     Defendant Edward J. O'Connor ("O'Connor") served as the Company's President and Director during the Class Period.

12.     Defendants Cassidy and O'Connor are referred to herein as the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

13.    The Company was established in February 2000 and engaged in an initial public offering in May 2005.  It is a provider of natural gas and other energy derivatives trading and brokerage services, providing services to brokerage firms, financial institutions, energy traders and hedge funds.  The Company has also developed an automated derivatives trading platform, which provides a real-time electronic trade matching and brokerage system designed to improve liquidity and transparency in the energy derivatives market.

14.    The majority of Optionable's revenues are derived from business which it transacts on behalf of its largest customer, the Bank of Montreal ("BMO"), and during the Class Period, the Company touted its continued growth, dependance on and close relationship with BMO.

15.    In reality, however, the Company was engaged in improper transactions in connection with its relationship with BMO, eventually causing BMO to suffer losses of roughly $300 to $400 million on those transactions and causing BMO to terminate its relationship with the Company. When news of BMO's losses and decision to terminate its relationship with the Company was revealed, the Company's stock sank by 90% and caused public shareholders millions of dollars in losses.

### *False Statements and Material Omissions*

16.    Throughout the Class Period, Optionable issued false statements and made material omissions therewith regarding its business fundamentals and financial results.  While touting its continued success, Defendants failed to disclose the enormous dependance it had on its largest client, BMO, and the extent to which Optionable aided BMO to hide hundreds of millions of dollars in losses incurred by BMO in connection with trades BMO transacted through Optionable.  Indeed,

4

helping BMO hide this enormous losses was essential in retaining BMO as a client. In all, Defendants failed to disclose that its business prospects were built on falsifying trades it conducted for BMO

17.    In its Prospectus filed with the SEC on May 6, 2005, Optionable made the following representation concerning the Bank of Montreal: "One of our customers, Bank of Montreal, accounted for approximately 10% of our revenues during 2004. Two of our customers, Bank of Montreal and Coral Energy Holding, L.P., accounted for approximately 17% and 10%, respectively, of our revenues during 2003."

18.    In its Form 10-K filed with the SEC on March 15, 2006, for the year ended December 31, 2005, Optionable represented that the Bank of Montreal accounted for 18% of its revenues during 2005.

19.    On July 25, 2006, the Company issued a press release stating in part:

Optionable Reports Record Results and Strong Growth for Second Quarter 2006

BRIARCLIFF MANOR, N.Y., July 25 /PRNewswire-FirstCall/ -- Optionable, Inc. (OTC Bulletin Board: OPBL), a rapidly growing provider of natural gas and other energy derivatives brokerage services, today announced record results from operations for the quarter ended June 30, 2006.

    . . . .

"We are pleased to be able to report continued strong year over year growth in the volume of options traded along with the growing demand for our brokerage services," said Kevin Cassidy, chief executive officer of Optionable. "We continued to see strong demand for natural gas contracts even as we moved out of the traditional peak demand during the winter heating months in the northeast. *Our continued growth reflects our ability to execute trades in a demanding market and provide our customers with broad access to counterparties."*

20.    On October 26, 2006, the Company issued a press release which stated in part:

Optionable Inc Reports Record Results for the 2006 Third Quarter, First Nine Months

BRIARCLIFF MANOR, N.Y., Oct. 25 /PRNewswire-FirstCall/ -- Optionable, Inc (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced today record results from operations for its third quarter and nine months ended September 30, 2006, posting strong gains in revenue, net income and EPS. The Company said that revenues increased 166 percent and 123 percent, respectively, compared to prior year periods, and net income also reached all time highs, increasing 216 percent and 270 percent, respectively, from the prior year periods.

Revenues for the third quarter ended September 30, 2006 were $4.5 million, up from $1.7 million for the third quarter of last year. Net income for the third quarter increased to $2.2 million, up from $694,218 for the third quarter of 2005. Gross profit increased 153 percent to $2.7 million for this year's third quarter compared to $1.1 million for the same period last year. Diluted earnings per common share increased to $0.04 per share, on 51,680,993 diluted shares, for the third quarter of 2006, versus $0.01 per share, on 51,461,963 diluted shares, for the third quarter of 2005.

***CEO Kevin Cassidy commented, "It is clear from the recent news headlines that there is increased interest in derivatives trading. And we feel that the best is yet to come for Optionable. Our record results for the third quarter have primarily been achieved through traditional means of service of delivery, voice-brokerage and open outcry. Our electronic platform, OPEX, which we recently introduced, will gain adherents in the energy commodities markets and, ultimately, with other commodities markets. The latest addition to our services offering, OPEX Analytics, enables us to offer a broader variety of solutions to satisfy our clients' needs. We certainly would not be where we are without providing consistent, timely, and outstanding quality services to our clients."***

      21.    On February 6, 2007, the Company issued a press release announcing its 2006 Fourth Quarter and Full Year results. It stated in part:

Optionable Reports Record Results for the 2006 Fourth Quarter and Full Year Revenue and Net Income Increase to All Time Highs
VALHALLA, N.Y., Feb. 6 /PRNewswire-FirstCall/ -- Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced today record results for its fourth quarter and year ended December 31, 2006. The Company said that revenues increased 310 percent for the fourth quarter and 177 percent for the full year compared to prior-year

6

periods, and net income reached all-time highs, increasing 859 percent for the fourth quarter and 393 percent for the full year compared to prior-year periods.

. . . .

*Commenting on the results, Optionable CEO Kevin Cassidy said, "2006 was a benchmark year for us, with the launch of our electronic trading platform, OPEX(R), as well as our Analytics service. We're particularly happy with these results as they are due almost entirely to our customers' positive response to the innovative and impeccable service we delivered to them. These results also demonstrate a very healthy and largely untapped market for our derivative brokerage services.*

"The results for the quarter and the year were driven primarily by our voice-brokerage and open outcry service; however, OPEX, which we launched in July 2006, is beginning to add to our overall revenue mix. We expect that the efficiency of OPEX in executing trades, will cause its contribution to revenue to become a substantial portion of the mix as we progress into 2007 and even 2008, particularly as we begin to open up the market for our services."

*Cassidy continued, "We intend to build on the success we've enjoyed to date, adding products and services beyond our capabilities in the energy derivative market and Analytics.* We intend to look at expanding our relationship with NYMEX, and increase the traction of OPEX. In short, there are a number of strategic opportunities in front of us and we will examine each one thoroughly and carefully in order to continue building Optionable into a force in the derivatives brokerage business.

22.     On March 9, 2007, the Company issued a press release announcing further growth

in its business.  It stated in part:

Optionable Announces Trading of Swap Contracts on OPEX(R)
VALHALLA, N.Y., March 9 /PRNewswire-FirstCall/ -- Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced the availability of seven new swap contracts on its OPEX platform.

*Optionable President Edward O'Connor said, "We believe that the addition of the swap contracts is a logical extension and outgrowth of our trading services business. We are continuously executing our strategy and diversifying our product line to help our clients maximize the opportunities in the market. By adding the swaps contracts to our platform, it will allow our customers a wider variety of trading products and provide greater volume of trading.*

7

23.     In its Form 10-K filed with the SEC on March 23, 2007 for the year ended December 31, 2006, Optionable revealed that the Bank of Montreal accounted for 24% of its revenues during 2006.

24.     On April 10, 2007, the Company issued a press release announcing that the New York Mercantile Exchange had bought 19% of the Company. It stated in part:

> Optionable Announces Completion of Transaction for NYMEX Holdings to Purchase 19 Percent of Optionable Shares
> VALHALLA, N.Y., April 10 /PRNewswire-FirstCall/ -- Optionable, Inc. (OTC Bulletin Board: OPBL) ("Optionable" or the "Company"), a leading provider of natural gas and other energy derivatives brokerage services, announced that pursuant to the binding term sheet announced on January 22, with three of its founding stockholders, have completed and signed definitive agreements with NYMEX Holdings, Inc. (NYSE: NMX) ("NYMEX"), pursuant to which NYMEX has acquired 19 percent of Optionable.
> 
> . . . .
> 
> ***Optionable CEO Kevin Cassidy said, "The completion of this transaction is a major strategic step for the Company, allying us closely with the world's largest exchange for the trading of energy futures and options contracts. I am convinced that our close relationship with NYMEX will be an important catalyst in helping drive and accelerate our future growth."***

24.     On April 23, 2007, the Company issued a press release stating in relevant part:

> Optionable Expands Trading With New Products on OPEX(R)
> VALHALLA, N.Y., April 23, 2007 PRNewswire-FirstCall via COMTEX News Network -- Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced the availability of new products on its electronic trading OPEX platform. American-style options on natural gas (ON), RBOB gasoline (OB), heating oil (OH), will be available to trade on OPEX on May 7, 2007. Dubai Crude Oil Calendar Swap Futures (Platts) (DC), will be available to trade on Monday, April 23, 2007.
> 
> "The electronic trading continues to grow thanks to the increase acceptance and accessibility. The portion of light sweet crude oil options traded on OPEX last week was approximately 3% of NYMEX total volume for such options," said Optionable President Edward O'Connor. "We will continue to add products to OPEX to serve the needs of our clients."

American-style options are contracts that may be exercised at any time before expiration. They differ from European-style options contracts, which may be exercised only on the expiration date.

### *BMO Announces Losses*

25.    On April 27, 2007, the Bank of Montreal ("BMO") disclosed that it had lost between $300 to $400 million in trades executed through Optionable. On that day, the price of Optionable stock dropped from a previous day closing price of $8.29 to a closing price of $5.56, a single day drop of $2.73 or 33%.

26.    On April 30, 2007, Mark DeCambre, writing for *TheStreet.com*, explained that as a practical matter, based on fees received by BMO and others related directly to the deals for which Optionable served as BMO's broker, BMO accounted for 86% of Optionable's brokerage fees.

27.    Notwithstanding these enormous losses incurred by a substantial client of Optionable's, Defendants continued to paint a rosy picture about the current status and outlook of the Company, and its seriously deteriorating relationship with BMO. On a conference call with investors on May 1, 2007, Defendant Cassidy remarked that "[w]e [Optionable] still have all of our customers. They said they are going to stay in the business. They probably have more supervisory around the risk right now." According to a *Bloomberg* article about this conference call,

> There's no indication from the Toronto-based bank [BOM] that it will be doing less business with the Valhalla, New York-based brokerage, Chief Executive Officer Kevin Cassidy said today in a conference call.

It was also revealed on this conference call that BMO accounted for $2.7 million of Optionable's $9.1 million of revenue in that quarter.

28.    On May 1, 2007, the Company filed with the SEC on form 10-QSB, its 2007 First Quarter results. Also on that day, the Company issued the following press release:

Optionable Reports Results for First Quarter 2007

Revenue and Net Income Up 307 Percent and 276 Percent, Respectively

VALHALLA, N.Y., May 1 PRNewswire-FirstCall -- Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced today results for its first quarter ended March 31, 2007. *The Company said that revenues increased 307 percent for the first quarter compared to the prior-year period, and net income increased 276 percent for the first quarter as compared to the prior-year period.*

29.    The day following the issuance of the May 1, 2007, press release Mark Nordlicht

("Nordlicht"), who served as Chairman and Director, resigned from both positions and Albert

Helmig, a Director of the Company, was appointed Chairman.   According to a Company press

release issued that same day:

Optionable Inc Elects New Chairman of the Board

VALHALLA, N.Y., May 2 PRNewswire-FirstCall/ -- Optionable Inc (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced that Albert Helmig, 55, a commodity trading veteran, has been elected Chairman of the Board. The appointment, first announced on the Company's first quarter 2007 earnings held yesterday, follows the resignation of Mark Nordlicht as Chairman, who has decided to dedicate his time and energy to his primary business enterprises. Nordlicht also resigned his position as Director.

Optionable Inc President Edward O'Connor said, "I'm pleased to announce that Albert, who has served as a Director on our Board since September 2004, was elected Chairman by a unanimous vote of the Board. Albert has more than 35 years in the commodity trading industry and is the former Vice Chairman of NYMEX. For 10 years, he served on the NYMEX Board, and on the Executive Committee, which is just one of the more than 20 committees on which he served as chair or vice-chair while on the NYMEX Board. We are very happy that Albert has accepted the position. His vast knowledge, experience, and perspective will be of great value to Optionable going forward."

Nordlicht commented on the appointment saying, "In my opinion there's no one person better able to help steer Optionable to success at this point. I've worked very closely with Albert, and everyone at Optionable, and I have enjoyed every moment.

I step down knowing that the hard work we've all put into getting this company going will not be for naught under his leadership."

30.     On May 8, 2007, BMO announced that it was "suspending all of its business relationships" with Optionable and "all derivatives trading through that firm, pending the results of a full external review which is ongoing." BOM also announced that two of its commodity trading professionals were on leave pending the results of the external review.

31.     On May 9, 2007, the Company issued the following statement:

VALHALLA, NY (May 9, 2007) . . . . Optionable Inc, (OTCBB: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, said today that one of its clients recently incurred some losses that have become a subject of public discussion. Albert Helmig, Optionable Chairman, said, "Gains and losses are both inevitable in trading energy derivatives. We are never pleased when losses dominate for one of our clients, but we do not design or help to design their strategies, nor are we financial advisors. We provide brokerage and execution services for trades that we are instructed to make by our clients. We believe strongly that our brokerage and execution services are and have been rendered appropriately, professionally and correctly."

32.     Also on May 9, 2007, the Company filed with the SEC a report on Form 8-K which read as follows:

On May 8, 2007, BMO Financial Group ("BMO") issued a statement indicating that BMO is suspending its business relationships with Optionable, Inc. (the "Company"), as well as all derivatives trading through the Company, pending the results of an ongoing external review of certain commodity trading losses incurred by BMO. BMO has accounted for a significant portion of the Company's revenues. The Company believes that it is likely that BMO's statement and suspension will have an adverse effect on the Company's business, including its future results of operations and financial condition. The Company is unable to quantify the impact of BMO's statement and suspension at this time.

On May 9, 2007, The New York Mercantile Exchange, Inc., a subsidiary of the NYMEX Holdings, Inc., announced that it will offer options trading for crude oil, natural gas, gold, and silver on the CME Globex electronic trading platform beginning in June 2007. We believe that some of the contracts trading on the CME Globex platform may compete with contracts trading on the Company's OPEX

11

platform. The Company is unable to quantify the impact of this potential competition on its business, including its future results of operations and financial condition.

33.    Despite the dire situation, Optionable's new CEO, Albert Helmig, continued to paint a rosy picture of Optionable's future. He was quoted as saying on May 9 that: "In the extreme scenario, that they go away tomorrow, someone else comes in and fills BMO's place."

34.    Finally, on May 10, 2007, it was disclosed that Deloitte & Touche LLP had conducted an audit of, and prepared a report in connection with, the trades BMO had conducted with Optionable. BMO had engaged Deloitte in early February to conduct the audit and received the final report in late April. BMO disclosed its losses on April 27 soon after receiving Deloitte's report.

35.    According to the report, Deloitte found there had been "serious mismarking of the book of natural-gas options," and that it had "never seen such a wide discrepancy in terms of pricing" between the values marked in BMO's portfolio of natural-gas options and their market value. According to news reports, the Deloitte report indicated that some of the prices used in BMO's mismarked book of trades were provided by Optionable.

36.    As a result of these findings, BMO placed its commodities trade David Lee, and its executive head of commodity products, Bob Moore, on a leave of absence.

37.    Sources close to Mr. Lee and Optionable say the BMO trader, widely regarded as the biggest natural-gas options trader in the market, had a close personal relationship with the senior management of Optionable, including Defendant Cassidy.

38.    Accordingly, Optionable was extremely dependent on Mr. Lee for a large portion of their business and only by mismarking options – changing the prices of options which Mr. Lee transacted – and hiding Mr. Lee's enormous losses, was Optionable able to have, and retain, BMO

as a client. Without Optionable's complicity in the fraudulent arrangement with Mr. Lee to mismark

options, Mr. Lee would have been removed and BMO would not have had its relationship with

Optionable. By failing to disclose these facts, Optionable's stock was artificially inflated. Indeed,

Defendants' capitalized on the artificial inflation by selling over $28 million worth of Company

stock at the height of the fraud and the stock's artificial inflation. On May 10, 2007, following the

disclosure of these truths, Optionable stock closed at $0.84, a loss of over 90% of its value. As a

result, investors lost millions of dollars.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

39.    At all relevant times, the market for Optionable common stock was an efficient

market for the following reasons, among others:

    a.    Optionable common stock was listed and actively traded on the OTC;

    b.    As a regulated issuer, the Company filed periodic public reports with the
          SEC; and,

    c.    Optionable regularly issued press releases which were carried by national
          news wires. Each of these releases was publicly available and entered the
          public marketplace.

40.    As a result, the market for Optionable securities promptly digested current

information with respect to the Company from all publicly-available sources and reflected such

information in the Company's stock price. Under these circumstances, all purchasers of Optionable

common stock during the Class Period suffered similar injury through their purchase of stock at

artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

41.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint. To the extent that the specific statements pleaded herein were identified as forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## SCIENTER ALLEGATIONS

42.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company and its business practices, their control over and/or receipt of the Company's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Optionable were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

14

This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's business, finances, and operations. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including Defendants.

43.     Defendants engaged in such a scheme to inflate the price of Optionable common stock in order to: (a) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (b) enhance the value of their personal holdings of Optionable common stock and options; and, (c) to use the Company's stock as currency for further corporate acquisitions.

44.     On April 10, 2007, Company insiders engaged in massive insider sales, involving 10,758,886 shares of Company stock, for proceeds of $28,941,403, as follows:

        a.     Defendant Cassidy sold 1,905,000 shares of Company stock for proceeds of $5,124,450.

        b.     Defendant O'Connor sold 1,853,886 shares of Company stock for proceeds of $4,986,953.

        c.     Nordlicht sold 7,000,000 shares of Company stock for proceeds of $18,830,000.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rule of Civil Procedure on behalf of a Class, consisting of all persons who purchased or otherwise acquired Optionable common stock during the Class Period and who were damaged

thereby. Excluded from the Class are Defendants, members of the immediate family of each of the Defendants, any subsidiary or affiliate of Optionable and the directors, officers, and employees of Optionable or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

44.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States. Record owners and other members of the Class may be identified from records maintained by the Company and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

45.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.       whether Defendants participated in and pursued the common course of conduct complained of herein;

c.       whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition, and prospects of Optionable;

d.       whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance, and prospects of the Company;

e.       whether the market price of Optionable common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.       the extent to which the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

### FIRST CLAIM

**(Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants)**

49.     Plaintiff repeats and realleges each and every allegation contained above.

17

50.    Each of the Defendants: (a) knew or recklessly disregarded material adverse non-public information about the Company's financial results and then existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports, and other public representations of and about Optionable.

51.    During the Class Period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52.    Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of Optionable stock during the Class Period.

53.    Plaintiff and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for Optionable stock. Plaintiff and the Class would not have purchased Optionable stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

## SECOND CLAIM

### (Violation Of Section 20(a) Of The Exchange Act
### Against the Individual Defendants)

54.     Plaintiff repeats and realleges each and every allegation contained above.

55.     The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act. By reason of their senior executive positions they had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

56.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Optionable stock during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees ands expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: May 11, 2007                    Respectfully submitted,

**SARRAF GENTILE LLP**

Ronen Sarraf
Joseph Gentile
485 Seventh Avenue, Suite 1005
New York, NY 10018
(212) 868-3610

**SCHATZ NOBEL IZARD P.C.**
Andrew Schatz
Jeffrey S. Noble
20 Church Street, Suite 1700,
Hartford, CT 06103
(860) 493-6292

*Attorneys for Plaintiff*

20

## CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, _Robert Rastocky_, make this declaration pursuant to the federal securities laws.

1.    I seek to serve as plaintiff in the foregoing complaint (the "Complaint").

2.    I have reviewed the Complaint and authorize its filing.

3.    I did not purchase stock in Optionable, Inc. ("Optionable" or the "Company") at the direction of my counsel in order to participate in any private action arising under the securities laws.

4.    I am willing to serve as a lead plaintiff either individually or as a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial, if necessary.

5.    During the three year period preceding the date of my signing this Certification, I have not served nor sought to serve as a representative party on behalf of a class, except (if any):

6.    My transactions in Optionable stock are as follows: _Since 5-1-2007_  _May 1st 2007_

| Trade Date | No. of Shares | Price Per Share | Buy or Sell |
|------------|---------------|-----------------|-------------|
|            | _See_         | _Attached_      |             |
|            |               |                 |             |

Please attach additional pages if necessary.

7.    I will not accept any payment for serving as a representative party on behalf of the class beyond the pro rata share of any possible recovery, plus reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as approved by the Court.

I declare under penalty of perjury this _10_ day of _May_ 2007, that the foregoing is true and correct.

_____
Signature

Address:  _5110 E. Monte Cristo Ave_
          _Scottsdale AZ 85254_

Phone:    _480-459-1113_

Email:    _ROBERTY RENTALS @ HOTMAIL.COM_

*Robert Rasrocky*

Filled Buy 1000 OPBL Limit 4.10 -- -- 15:07:46 05/03/07
Filled Buy 1000 OPBL Limit 4.47 -- -- 10:47:30 05/07/07
Filled Buy 500 OPBL Limit 4.53 -- -- 11:01:26 05/07/07
Filled Buy 500 OPBL Limit 4.74 -- -- 11:42:12 05/07/07
Filled Sell 500 OPBL Limit 4.75 -- -- 09:53:30 05/08/07
Filled Buy 1000 OPBL Limit 4.67 -- -- 13:12:26 05/08/07
Filled Buy 500 OPBL Limit 4.69 -- -- 13:32:40 05/08/07
Filled Buy 500 OPBL Limit 4.65 -- -- 15:47:04 05/08/07
Filled Buy 200 OPBL Limit 4.62 -- -- 15:54:01 05/08/07
Filled Sell 700 OPBL Market 4.61 -- -- 15:56:18 05/08/07
Filled Buy 1000 OPBL Limit 3.0175 -- -- 09:30:25 05/09/07
Filled Buy 1762 OPBL Limit 3.015 -- -- 09:30:38 05/09/07
Filled Buy 238 OPBL Limit 3.015 -- -- 09:30:38 05/09/07
Filled Buy 1000 OPBL Limit 3.0175 -- -- 09:31:47 05/09/07
Filled Buy 12 OPBL Limit 2.97 -- -- 09:34:22 05/09/07
Filled Buy 300 OPBL Limit 2.97 -- -- 09:34:22 05/09/07
Filled Buy 188 OPBL Limit 2.97 -- -- 09:34:22 05/09/07
Filled Buy 300 OPBL Limit 3.04 -- -- 09:49:09 05/09/07
Filled Buy 200 OPBL Limit 3.10 -- -- 09:57:18 05/09/07
Filled Buy 300 OPBL Limit 3.04 -- -- 10:06:38 05/09/07
Filled Buy 200 OPBL Limit 3.04 -- -- 10:02:22 05/09/07
Filled Buy 500 OPBL Limit 3.04 -- -- 10:10:16 05/09/07
Filled Sell 1250 OPBL Limit 3.02 -- -- 10:11:45 05/09/07
Filled Buy 200 OPBL Limit 2.935 -- -- 10:21:03 05/09/07
Filled Buy 500 OPBL Limit 2.94 -- -- 10:22:06 05/09/07
Filled Buy 500 OPBL Limit 2.89 -- -- 10:40:17 05/09/07
Filled Buy 500 OPBL Limit 2.96 -- -- 10:50:54 05/09/07
Filled Buy 200 OPBL Limit 2.975 -- -- 10:51:51 05/09/07
Filled Sell 500 OPBL Limit 3.00 -- -- 10:52:38 05/09/07
Filled Sell 16 OPBL Limit 3.07 -- -- 10:56:58 05/09/07
Filled Sell 434 OPBL Limit 3.07 -- -- 10:56:57 05/09/07
Filled Buy 100 OPBL Limit 3.22 -- -- 11:03:08 05/09/07
Filled Buy 200 OPBL Limit 3.07 -- -- 11:11:25 05/09/07
Filled Buy 500 OPBL Limit 3.08 -- -- 11:12:32 05/09/07
Filled Buy 200 OPBL Limit 3.11 -- -- 11:17:49 05/09/07
Filled Buy 200 OPBL Limit 3.12 -- -- 11:20:21 05/09/07
Filled Sell 340 OPBL Limit 3.08 -- -- 11:32:30 05/09/07
Filled Sell 1400 OPBL Market 3.015 -- -- 11:46:17 05/09/07
Filled Buy 500 OPBL Limit 3.02 -- -- 11:47:08 05/09/07
Filled Buy 100 OPBL Limit 3.02 -- -- 11:56:05 05/09/07
Filled Buy 100 OPBL Limit 3.02 -- -- 11:55:59 05/09/07
Filled Sell 1000 OPBL Market 3.00 -- -- 11:57:09 05/09/07
Filled Sell 380 OPBL Market 3.00 -- -- 11:57:57 05/09/07
Filled Sell 70 OPBL Market 3.00 -- -- 11:57:31 05/09/07
Filled Sell 250 OPBL Market 3.00 -- -- 11:57:31 05/09/07
Filled Sell 300 OPBL Market 3.00 -- -- 11:57:31 05/09/07
Filled Sell 832 OPBL Market 2.975 -- -- 12:04:31 05/09/07
Filled Sell 28 OPBL Market 2.99 -- -- 12:02:09 05/09/07
Filled Sell 2000 OPBL Market 2.975 -- -- 12:04:31 05/09/07
Filled Sell 1800 OPBL Market 2.95 -- -- 12:07:22 05/09/07
Filled Sell 200 OPBL Market 2.95 -- -- 12:07:17 05/09/07
Filled Sell 500 OPBL Market 2.88 -- -- 13:37:35 05/09/07

*Total Loss over £7000*

*Robert Rasrodny*

```
Filled Sell 2500  OPBL Market 2.88  --  -- 13:37:35 05/09/07
Filled Buy 1000  OPBL Limit 1.19  --  -- 12:53:19 05/10/07
Filled Buy 2000  OPBL Limit 1.19  --  -- 12:51:33 05/10/07
Filled Buy 1000  OPBL Limit 1.135  --  -- 13:02:35 05/10/07
Filled Sell 1000  OPBL Limit 1.14  --  -- 13:33:41 05/10/07
Filled Sell 2000  OPBL Limit 1.11  --  -- 13:39:14 05/10/07
Filled Sell 1000  OPBL Limit 1.08  --  -- 13:40:32 05/10/07
```